**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CANATEX COMPLETIONS SOLUTIONS, INC.** | § § § § § § § | |
| **Plaintiff,** | | |
| **v.** | | **CIVIL ACTION NO. 4:22-CV-3306** |
| **WELLMATICS, LLC, GR ENERGY SERVICES, LLC, GR ENERGY SERVICES MANAGEMENT, LP, AND GR ENERGY SERVICES OPERATING GP, LLC, GR WIRELINE, L.P.** | § § § § § § § § | |
| **Defendants.** | | |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  LEGAL STANDARD ........................................................................................... 4

III.  ARGUMENT ...................................................................................................... 5

   A.  "a release position that permits the releasable engagement profile to expand radially to release the connection profile of the second part" (claims 1, 7, 13) ............................................ 5

     1.  There is No Dispute That the Term is Indefinite Without Correction ........................... 5

     2.  The Patent Does Not Qualify for Judicial Correction ................................... 9

   B.  "source of fluid pressure" (claims 1, 13) ........................................................ 16

   C.  "a releasable engagement profile which *internally engages* the connection profile of the first part" (claims 1, 7, 13) ........................................................ 20

     1.  Defendants' Proposed Construction is Fully Supported by the Intrinsic Record ......... 21

     2.  Plaintiff's Proposed Construction is Overly Broad and Attempts to Recapture Surrendered Claim Scope ......................................................... 26

   D.  "expansion chamber" (claims 1, 7, 8, 13) ........................................................ 28

   E.  "wherein the first part carries a first electrical connection, and the second part carries a second electrical connection, the first and second electrical connection being electrically connected when the releasable engagement profile of the second part engages the connection profile of the first part, and becomes disconnected when the releasable engagement profile disengages the connection profile" (claims 12, 13) ................................................. 33

IV.  CONCLUSION .................................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acumed v. Stryker Corp.*,
    483 F.3d 800 (Fed. Cir. 2007)................................................................................34

*Aptalis Pharmatech, Inc. v. Apotex Inc.*,
    718 F. App'x 965 (Fed. Cir. 2018)..................................................................22, 25

*AstraZeneca AB v. Mylan Pharms. Inc.*,
    19 F.4th 1325 (Fed. Cir. 2021) ...............................................................4, 22, 25

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001)..............................................................................5

*Buggies v. Hous. Heavy Mach.*,
    No. H-21-616, 2022 WL 1639284 (S.D. Tex. May 24, 2022) .......................19, 32

*Comark Commc'ns, Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998)..............................................................................4

*ContentGuard Holdings, Inc. v. Amazon.com, Inc.*,
    No. 2:13–CV–1112–JRG, 2015 WL 1289321 (E.D. Tex. Mar. 20, 2015) ...........11

*E.Digital Corp. v. Futurewei Techs., Inc.*,
    772 F.3d 723 (Fed. Cir. 2014)...........................................................................19, 32

*Eon Corp. v. Silver Spring Networks, Inc.*,
    815 F.3d 1314 (Fed. Cir. 2016)...................................................................2, 20, 29

*Finjan, Inc. v. Cisco Sys.*,
    837 F. App'x 799 (Fed. Cir. 2020)....................................................................5, 18

*Gilead Scis., Inc. v. Watson Lab's, Inc.*,
    No. 15-2350 (RMB/JS), 2016 WL 1690306 (D.N.J. Apr. 26, 2016)....................12

*GREE, Inc. v. Supercell Oy*,
    No. 2:19-cv-00413-JRG-RSP, 2020 WL 6559435 (E.D. Tex. Nov. 6, 2020)......16

*H-W Tech., L.C. v. Overstock.com, Inc.*,
    758 F.3d 1329 (Fed. Cir. 2014)........................................................................9, 10

*Hakim v. Cannon Avent*,
    479 F.3d 1313, 1317-18 (Fed. Cir. 2007)............................................................26

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008)..........................................................................6

*LG Elecs., Inc. v. Quanta Computer Inc.*,
566 F. Supp. 2d 910 (W.D. Wis. 2008) ...............................................................1

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ........................................................................................5, 7

*Nobel Biocare Servs. AG v. Instradent U.S., Inc.*,
903 F.3d 1365 (Fed. Cir. 2018)..................................................................18, 19

*Novo Indus., L.P. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003)..........................................................................9

*Ollnova Techs. v. Ecobee Techs.*,
No. 2:22-CV-00072-JRG, 2023 WL 2871051 (E.D. Tex. Apr. 10, 2023)...........10

*Parthenon Unified Memory Architecture LLC v. Apple Inc.*,
No. 2:15-cv-00621-JRG-RSP, 2016 WL 3365945 (E.D. Tex. June 16, 2016) ........ 7, 8, 15, 16

*Pavo Sols. v. Kingston Tech. Co.*,
35 F.4th 1367 (Fed. Cir. 2022) ...................................................................14, 15

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020)........................................................................22

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................*passim*

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004)........................................................................32

*R2 Sols. v. Deezer S.A.*,
No. 4:21-CV-90, 2022 WL 36240 (E.D. Tex. Jan. 4, 2022) ...................................11

*Resonate Inc. v. Alteon Websystems, Inc.*,
338 F.3d 1360 (Fed. Cir. 2003).........................................................................4

*SAS Inst. Inc. v. World Programming Ltd.*,
No. 2:18-cv-295-JRG, 2020 WL 569856 (E.D. Tex. Feb. 5, 2020) .....................11

*Smartflash LLC v. Apple Inc.*,
77 F. Supp. 3d 535 (E.D. Tex. 2014) ................................................................11

*Smith v. Orbcomm, Inc.*,
No. 2:14-CV-666, 2015 WL 5302815 (E.D. Tex. Sep. 10, 2015)............... 11, 12, 16

*Trusted Knight Corp. v. Int'l Bus. Machs. Corp.*,
    681 F. App'x 898 (Fed. Cir. 2017)..................................................................10

*Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*,
    No. 2:18-cv-0041-JRG-RSP, 2019 WL 1614724 ....................................... 12, 14

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)....................................................................23

*Wasica Fin. GMBH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017) ................................................................ 18, 19

**Statutes**

35 U.S.C. § 251 ................................................................................................12

35 U.S.C. § 254 ................................................................................................12

35 U.S.C. § 255 ................................................................................................12

35 U.S.C. § 311(b) .............................................................................................9

**TABLE OF EXHIBITS**

| Exhibit No. | Document Name |
|:---:|:---|
| 1 | U.S. Patent No. 10,794,122 (the "'122 Patent") |
| 2 | Declaration of Gary Wooley, Ph.D. |
| 3 | File History of U.S. Patent No. 10,794,122 (excerpts) |
| 4 | U.S. Patent No. 5,984,006 ("Read") |
| 5 | U.S. Patent No. 6,095,583 ("Beeman") |

Defendants GR Energy Services Management, LP, GR Energy Services Operating, GP, LLC, GR Wireline, L.P., and Wellmatics, LLC (collectively "Defendants") submit this brief in response to Plaintiff Canatex Completions Solutions, Inc.'s Opening Claim Construction Brief (ECF No. 84) addressing disputed terms of U.S. Patent No. 10,794,122 ("the '122 Patent").

I.     **INTRODUCTION**

The resolution of a single dispute will decide if the Court needs to conduct claim construction at all in this case.  And, in turn, the Court's decision on this pivotal issue could resolve the case entirely.  The critical issue is: should the Court effectively step into the role of the U.S. Patent Office ("USPTO") to correct the patentee's drafting errors that Plaintiff admits exist in every claim and throughout the patent's specification?  The answer is no.  Plaintiff has come nowhere close to meeting the bar to have the Court intervene on its behalf and save its defectively drafted patent, and Plaintiff "should have known its attempt [is] meritless in light of the nearly impossible standard for judicial correction of a patent." *LG Elecs., Inc. v. Quanta Computer Inc.*, 566 F. Supp. 2d 910, 913 (W.D. Wis. 2008).  Correcting or redrafting claims should happen at the USPTO, not in district Court.  The term at issue, *". . . the connection profile of the second part"* (Section III.A.), is admittedly erroneous, is present in all independent claims, and is indefinite, rendering all claims in the '122 Patent invalid.

Without legal support for its extreme request to have the Court rewrite its patent, Plaintiff attempts to excuse its pervasive error as an "obvious clerical error" that a person of ordinary skill in the art ("POSA") would have no problem understanding.  But the true meaning of the claim terms and the specification is not apparent to a POSA with reasonable certainty, and Plaintiff cannot cure this fatal ambiguity through its conclusory declarations in its brief.  Tellingly, Plaintiff offers no argument (aside from one conclusory sentence) as to why the term, as written, is not indefinite.  Instead, Plaintiff simply requests that the Court judicially correct the patentee's

poor draftsmanship, without citation to a single case where a court has corrected claims and rewritten the specification.  Judicial correction is a rarely invoked remedy that occurs in the rarest of circumstances, which do not include rewriting a patent to save it from its own indefiniteness.  It is telling that Plaintiff could have sought correction via procedures at the USPTO, but made no attempt to do so despite being on notice of this issue for months.  On these facts, the only proper result in this forum is a finding of indefiniteness.

The Court should not accept Plaintiff's invitation to commit error in meeting the "nearly impossible" standard for judicially correcting indefinite patent terms.  Unless it elects to fix the patentee's drafting errors, this Court need not conduct further claim construction on the remaining claim terms because all of the patent's claims are invalid due to patentee's carelessness in drafting.

Should the Court attempt to correct Plaintiff's patent and  to construe the remaining disputed claim terms, the Court should reject each of Plaintiff's constructions because they stretch or ignore established law governing claim construction, as well as the evidence in the case.

Plaintiff's proposed constructions run afoul of fundamental claim construction principles.  For example, one of the most basic rules of claim construction is that claim terms "are generally given their ordinary and customary meaning," and "[o]rdinary meaning is not something that is determined 'in a vacuum.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); *Eon Corp. v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016).  Rather, "a word describing patented technology takes its definition from the context in which it was used by the inventor."  *Eon*, 815 F.3d at 1320.

Plaintiff disregards this fundamental claim construction doctrine when construing many of the terms at issue.  For instance, it ignores the context of the '122 Patent and proposes constructions that are entirely divorced from the patent's written description when construing two of the disputed terms—*"source of fluid pressure"* (Section III.B.) and *"expansion chamber"* (Section III.D.).  Even more troubling, in doing so, Plaintiff relies primarily on ***extrinsic evidence***, and imports definitions into the claims that are divorced from the patent's context.  And in multiple instances, Plaintiff relies on unrelated patents (extrinsic evidence) that have been determined by this Court and the Federal Circuit to be irrelevant.  For these disputed terms (and all others), the Court should look no further than the ***intrinsic record***, which entirely supports Defendants' constructions.

Plaintiff's violations of several claim construction principles makes abundantly clear that Plaintiff seeks whatever construction avoids the patent's invalidity and also supports Plaintiff's creative theory of infringement, even if unsupportable.  For example, when there is abundant evidence in the intrinsic record for a particular construction, Plaintiff argues against it.  *See* Section III.C.  But when there is negligible, if any, evidence in the intrinsic record for a proposed limitation to a claim term, Plaintiff argues for it.  *See* Section III.E.  Specifically with respect to the disputed term in Section III.C. ("a releasable engagement profile which . . ."), Plaintiff proposes that the Court give the term its "plain and ordinary meaning," but refuses to accept that the meaning in the context of the patent itself excludes certain features that the patentee plainly surrendered during prosecution.  Alternatively, for the term from Section III.E. ("wherein the first part carries a first electrical connection, . . ."), Plaintiff attempts to read a narrow limitation into the claims from the specification—the "cardinal sin" of claim construction—under the guise of a "clarification" to the term's plain meaning.

3

Plaintiff grasps for support for its tortured claim construction positions wherever it can, often in irrelevant extrinsic evidence.  Defendants, on the other hand, consistently advocate for constructions grounded in the intrinsic record (the claims, specification, and prosecution history) as required by the seminal case on claim construction, *Phillips*, and it progeny.  The difference in approach is stark, and it is only Defendants' constructions that are correct and properly supported.

## II.    **LEGAL STANDARD**

The Federal Circuit outlined the process for construing patent claims in *Phillips*, 415 F.3d 1303.  This analysis focuses on the intrinsic evidence, which includes the claims themselves, the specification, and the prosecution history.  *Id*. at 1314–17.  "[T]he context in which a term is used in the asserted claim" is instructive as to the meaning of particular claim terms.  *Id*. at 1314.  "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id*. at 1315 (citation omitted).  However, "particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364-65 (Fed. Cir. 2003); *see Phillips*, 415 F.3d at 1323.  The Court "should also consider the [] prosecution history, . . . which we have designated as part of the intrinsic evidence."  *Phillips*, 415 F.3d at 1317 (quotations omitted).  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id*.  And, contrary to the limited and selective view of the law that Plaintiff presents, the prosecution history is still highly relevant in the absence of a clear and unmistakable disavowal.  *See, e.g.*, *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1335

(Fed. Cir. 2021) (explaining that "even in the absence of a clear and unmistakable disavowal, . . .

the prosecution history can be evaluated to determine how a person of ordinary skill would

understand a given claim term," quoting *Aptalis Pharmatech, Inc. v. Apotex Inc.*, 718 F. App'x

965, 971 (Fed. Cir. 2018)).

The Court may also consider extrinsic evidence, such as technical dictionaries, learned

treatises, and expert testimony, but such evidence should be considered in the context of the

intrinsic record. *Phillips*, 415 F.3d at 1319. Extrinsic evidence cannot be used to "vary,

contradict, expand, or limit the claim language from how it is defined, even by implication, in the

specification or file history." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262

F.3d 1258, 1269 (Fed. Cir. 2001). Additionally, where "'an analysis of the intrinsic evidence

alone will resolve any ambiguity in [the] disputed claim term,' it is 'improper to rely on extrinsic

evidence." *Finjan, Inc. v. Cisco Sys*., 837 F. App'x 799, 806 (Fed. Cir. 2020) (quoting *Vitronics

Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

## III.   ARGUMENT

A.   **"a release position that permits the releasable engagement profile to expand radially to release the connection profile of the second part" (claims 1, 7, 13)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Indefinite | The claim phrase contains an obvious error and the correction is not subject to reasonable debate: a release position that permits the releasable engagement profile to expand radially to release the connection profile of the ~~second~~first part |

1.   <u>There is No Dispute That the Term is Indefinite Without Correction</u>

This claim term read in light of the specification and prosecution history fails to inform,

with reasonable certainty, one skilled in the art about the scope of the invention and is therefore

indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014). Plaintiff does

not attempt to argue that this term, in its current, uncorrected form, is definite.  Indeed, Plaintiff admits that there is an error in this claim language and asks this Court to save it from indefiniteness.  It does so not only by asking the Court to correct every claim in the patent, but also believes the Court should rewrite the specification to fix pervasive uncertainty that exists **_throughout the entire patent_**.  But Plaintiff ignores that it has not met and cannot meet the "nearly impossible" standard for judicial correction. Nor has it cited any case where any court has rewritten both the claims and the specification to save a patentee from its repeated poor draftsmanship.

All independent claims[1] in the '122 Patent (claims 1, 7, 13) introduce "a **_first part_** comprising an external connection profile" and a second part comprising different components. However, in subsequent clauses the independent claims reference "**_the_** connection profile of the **_second part_**."  This second phrase inserts all sorts of uncertainty into the claims because, upon review of the specification, it is unclear which part of the phrase is the error.  The use of the word "the" in front of the remaining phrase is understood in patent parlance to refer to a prior introduction of "a connection profile of the second part," but no such prior introduction exists in the claim.  Therefore, as Plaintiff acknowledges, this term lacks antecedent basis.  ECF No. 84 at 9.

The error and resulting indefiniteness of this claim term is emphasized by the lack of antecedent basis.  "[A] claim [can] be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable" by a POSA.  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  This claim term's confusing language and lack of antecedent basis ultimately

---

[1] Because the error exists in every independent claim, it exists in every claim in the patent as all the dependent claims incorporate the flawed independent claims.

results in the claim entirely "fail[ing] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.

It is ambiguous and uncertain what "connection profile" this term is referencing. This is not a case where the patent makes clear that there is only one of a particular component and, thus, the antecedent basis is implied to a POSA. Rather, both the first and second parts have at least one connection profile. Tubing connector 22 is just one example of a connection profile on the second part. *See* Ex. 1 at Fig. 2; 2:59-62. A POSA therefore could not discern the boundaries of this term with reasonable certainty, since it is not clear whether the claimed invention encompasses a connection profile only on the first part *or* two different connection profiles with one on the first part and the other on the second. Ex. 2 at ¶¶ 56–59.

The specification only adds to the confusion, as it repeatedly references a connection profile on the first part and a connection profile on the second part. *E.g.*, Ex. 1 at Abstract, 2:57-58; 1:33-34; 3:31-32. The claims likewise do not provide any clarity as all independent claims suffer from this errant language and all mentions of a connection profile in the dependent claims either say "the connection profile of the first part" or say "the connection profile," without specifying which part it belongs to. The prosecution history is also plagued with the same issue and no clarifying explanation. That said, a POSA could not discern with reasonable certainty whether the limitation "the connection profile of the second part" is referring to a prior disclosed connection profile or something different all together. *See Parthenon Unified Memory Architecture LLC v. Apple Inc.*, No. 2:15-cv-00621-JRG-RSP, 2016 WL 3365945, at *12–14 (E.D. Tex. June 16, 2016) (finding a term indefinite for lack of antecedent basis, despite the plaintiff's arguments that "the drafter mistakenly wrote '*first* bus interface of the central

processing circuit' instead of '*second*'" and that this was clear because there was no first bus interface of the central processing unit) (emphasis added).

Tellingly, Plaintiff ignores the ambiguity in both the claims and specification, avoids explaining the proposed corrections that were disclosed to it in Dr. Wooley's claim construction disclosure,[2] and provides only one conclusory sentence as to why this term should not be held indefinite—"As explained above, the nature of the error at issue is remarkably apparent, as is the only reasonable correction."  ECF No. 84 at 13; *see* Ex. 2 at ¶¶ 63, 67.  Plaintiff uses over 6 pages of its brief to argue that the Court should correct all of the patentee's drafting errors in both the claims and the specification.  ECF No. 84  at 9–15.  Moreover, in arguing for judicial correction, Plaintiff asserts that, although the error appears in *all* independent claims and *multiple* times in the specification, including in the Abstract, the drafter's intent would be clear to a POSA since the error is essentially the same everywhere.  *Id*. at 10–11.  The opposite is true.  The pervasiveness of the error would only leave a POSA to infer that it was not an error, but an intentional (yet unclear) drafting choice.  Plaintiff also contends that "[i]f the error was indefinite as Defendants propose, the Examiner certainly would have rejected the claims on that basis."  *Id*. at 13.  This argument is nonsensical and contrary to precedent.  If an Examiner's failure to notice an error precluded a finding of indefiniteness, then no claim errors that inadvertently made it through prosecution (e.g., antecedent basis errors) would ever be indefinite.  That simply cannot be, and is not, the law.  *See, e.g.*, *Parthenon*, 2016 WL 3365945, at *13–14 (finding a claim term indefinite for a lack of antecedent basis error).

Moreover, Plaintiff's arguments regarding Defendants' silence on this issue, both during the parties' earlier preliminary injunction proceedings and in Defendants' IPR petition, are

---

[2] Plaintiff has had all the proposed corrections cited in this brief since June 9, 2023 as they were all included in Dr. Wooley's declaration that had to be provided to Plaintiff, pursuant to the Local Patent Rules.

unavailing.  First, neither Defendants nor their expert made *any* sort of explicit construction, let alone a conflicting one, for this claim term in the earlier proceedings.  Additionally, there is no obligation on Defendants to present their entire claim construction case during the preliminary injunction proceedings.  Defendants' choice to reserve its indefiniteness position for this proceeding has no bearing on the present dispute, nor does it render the errors in the patent nonexistent.  It should be noted, however, that Plaintiff's choices during the preliminary injunction proceedings (which are referenced later in this brief) ***do*** have consequences in the present dispute, since Plaintiff's expert argued plain meaning constructions that directly conflict with Plaintiff's current positions.  Second, Plaintiff's passing reference to the IPR petition filed by Defendants is of no moment.  It is unsurprising that Defendants applied Plaintiff's construction of this term "for purposes of [the] IPR only," "while reserving all rights to maintain its indefiniteness challenge in district court," because indefiniteness is not a legal challenge that can be asserted in an IPR proceeding.  ECF No. 84, Ex. J at 16–17, n.2; 35 U.S.C. § 311(b) ("A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 . . . .").

2.      The Patent Does Not Qualify for Judicial Correction

Although district courts have some authority to correct minor errors in patents, this authority is strictly limited.  A court may correct an error only if the error is obvious from the face of the patent.  *See, e.g.*, *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1333 (Fed. Cir. 2014); *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).  Even where there is an obvious error, "[a] district court can only correct a patent [] if: '(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the

claims.'" *Trusted Knight Corp. v. Int'l Bus. Machs. Corp.*, 681 F. App'x 898, 903 (Fed. Cir. 2017) (quoting *Novo Industries*, 350 F.3d at 1357).

### a.    *The Error Is Not Obvious on the Face of the Patent*

Plaintiff's suggestion that the term should be judicially corrected fails on the well-settled requirement that the patent contain an obvious error on its face. *See H-W Tech.*, 758 F.3d at 1333. To even be considered for judicial correction, "[t]he error must be evident from the face of the patent, . . . and the determination must be made from the point of view of one skilled in the art." *Ollnova Techs. v. Ecobee Techs.*, No. 2:22-CV-00072-JRG, 2023 WL 2871051, at *5 (E.D. Tex. Apr. 10, 2023) (quoting *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005), and *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009)) (internal quotations omitted).

Here, the error is pervasive and appears not just once in the claims, but in *every* single independent claim. The errant language also appears several times in the specification, including in the Abstract. Ex. 1 at Abstract, 1:33-34; 3:31-32. What is more, the many references to the second part's connection profile are not simply the result of a copy and paste mistake, since the language differs between some of the instances. *Compare id*. at 1:33-34 ("the connection profile of the second part", *with id*. at 3:31-32 ("connection profile 16 of second part 14"). It is also not evident to a POSA that this is a clerical error, since the second part has at least one connection profile—tubing connector 22. Ex. 2 at ¶¶ 60–61. This leaves a POSA to speculate whether "the connection profile of the second part" refers to tubing connector 22, refers to some other connection profile on the second part, or is a drafting mistake. *Id*.

If there were any doubt, Plaintiff's initial position in this case demonstrates that the error is not obvious. The error went entirely undetected by Plaintiff and Plaintiff's expert during the parties' earlier preliminary injunction proceedings. In fact, Plaintiff's expert, John Rodgers,

opined that this term should be given its plain and ordinary meaning, without any mention of an error.  Ex. 2 at ¶ 72; ECF No. 47-3 at ¶ 48 ("I have reviewed all claim terms recited in independent claim[] 13 . . . of the '122 Patent, and understand them to be plain and simple from the perspective of a person having ordinary skill in the art. For example, a POSITA would have no trouble understanding terms such as 'first part,' 'second part,' . . . . Consequently, it is my opinion that all claim terms should be given their plain and ordinary meaning.").  When seeking a preliminary injunction, Plaintiff asserted that the claims were clear and should be given their plain meaning, with no mention of a need for judicial correction.  Now, faced with an indefiniteness motion, it is evident that Plaintiff is now changing positions on this term simply to avoid an invalidity ruling.  *See Smith v. Orbcomm, Inc.*, No. 2:14-CV-666 (Lead Case), 2015 WL 5302815 at *12 (E.D. Tex. Sep. 10, 2015) (holding that the "Court does not find that the claims in this case include obvious clerical error when Plaintiff continues to argue for an alternative construction. . . . Plaintiff cannot have it both ways.").

b.     ***The Correction Is Subject to Reasonable Debate***

Even if the error were obvious on the face of the patent—and it is not—Plaintiff's position should be rejected because the proper correction is subject to reasonable debate.  Judges in the Eastern District of Texas have faced this very issue many times and have repeatedly noted that meeting this subject-to-reasonable-debate standard is "nearly impossible."  *See, e.g.*, *R2 Sols. v. Deezer S.A.*, No. 4:21-CV-90, 2022 WL 36240, at *19 (E.D. Tex. Jan. 4, 2022) (quoting *LG Elecs.*, 566 F. Supp. 2d at 913); *SAS Inst. Inc. v. World Programming Ltd.*, No. 2:18-cv-295-JRG, 2020 WL 569856, at *12 (E.D. Tex. Feb. 5, 2020) (same); *ContentGuard Holdings, Inc. v. Amazon.com, Inc.*, No. 2:13–CV–1112–JRG, 2015 WL 1289321, at *33, 35 (E.D. Tex. Mar. 20, 2015) (same); *Smartflash LLC v. Apple Inc.*, 77 F. Supp. 3d 535, 561 (E.D. Tex. 2014) (same). What is more, Federal Circuit precedent confirms that "judicial correction is a narrow remedy to

be used sparingly. It is the exception, not the rule, and should be employed only to correct an error that is so obvious that there is no question as to the proper correction." *Gilead Scis., Inc. v. Watson Lab's, Inc*., No. 15-2350 (RMB/JS), 2016 WL 1690306, at *2 (D.N.J. Apr. 26, 2016) (interpreting Federal Circuit caselaw on judicial correction).

When deciding if the Court should engage in judicial correction, the analysis is simple—if the Court finds that more than one correction "conform[s] to the specification" and would "conceivably fix the error," then the Court must refuse to judicially correct the term. *See Uniloc USA, Inc. v. Samsung Elecs. Am., Inc*., No. 2:18-cv-0041-JRG-RSP, 2019 WL 1614724 at *11–13. It is not the Court's job to correct deficient patent claims, and the Plaintiff is not without recourse if the Court declines to correct the term. Patent owners can easily petition the Patent Office at any time for a certificate of correction under 35 U.S.C. § 255. In fact, Plaintiff's failure to seek a certificate of correction with the Patent Office, despite having notice of the error for at least 4 months (from when Defendants served their preliminary invalidity contentions), weighs in favor of denying correction. *See Orbcomm*, 2015 WL 5302815 at *13 (finding a correction subject to reasonable debate and an error not evident from the face of the patent where "Plaintiff had notice of this issue [] at least [3 months prior to the decision]. Yet, Plaintiff ha[d] not taken any steps to obtain a certificate of correction from the PTO in accordance with 35 U.S.C. § 254 or 255."). Plaintiff has also had ample opportunity to seek reissue pursuant to 35 U.S.C. § 251 to correct the error in the patent and has not.

Plaintiff wrongly asserts that the "only reasonable correction" to this term is changing "second" to "first" as follows: ". . . the connection profile of the ~~second~~first part." ECF No. 84 at 11–12. Not only are there multiple other reasonable corrections, but a POSA would have reason to doubt Plaintiff's only proposed correction. Ex. 2 at ¶ 62. When drafting the disputed phrase,

the patentee deliberately included the language "of the second part," when the patentee could easily have ended the phrase after "the connection profile."  Had the patentee done so, it would have been clear that the "connection profile" was that "of the first part" and there would be no dispute.  Instead, the patentee chose to add "of the second part", which indicates to a POSA that the patentee intended to refer to a component on the second part, and it is no more likely or reasonable to be referring to a component on the first part.  *Id*.

Just one example of a reasonable alternative correction that maintains the language the "connection profile of the second part" is:  "a release position that permits the ~~releasable engagement profile~~locking piston to ~~expand radially to~~shift sufficiently to allow a sufficient force to be applied to a ~~release the~~ connection profile of the second part to allow disengagement of the releasable engagement profile from the connection profile of the first part."  This correction resolves the uncertain language, remedies the antecedent basis issue, and is fully consistent with the invention described in the specification and figures.  *Id*. at ¶¶ 63–66.  The specification states: "Once piston 32 has been shifted sufficiently, second part 14 may be disengaged from first part 12 by pulling applying [sic] a sufficient force to second part 14 to disengage releasable engagement profile 26 from the connection profile 16."  Ex. 1 at 4:62-65.  Put simply, once the piston shifts, a pulling force may be applied to tubing connector 22 (i.e., the connection profile of the second part) to disengage the releasable engagement profile from the connection profile of the first part.  *Id*. at 4:62-65; *see id*. at 2:59-62; Fig. 1.

The claim could ***also*** be corrected with the following phrases, which all resolve the ambiguous language and find sufficient support in the specification and figures:

i.   "a release position that permits the releasable engagement profile to expand radially to release the connection profile ~~of the second part~~" (*see, e.g.*, *id*. at Abstract; 1:32-34; 3:29-

13

32, 41-44; Fig. 1)—this correction is an alternative correction to the one suggested by Plaintiff, neither of which is more reasonable than the other.  The inquiry on judicial correction should end here;

ii.  "a release position that permits the ~~releasable engagement profile~~locking piston to expand ~~radially in~~to ~~release~~ the ~~connection profile~~expansion chamber of the second part" (*see id*. at 1:34-39; 3:33-44, 50-53; Fig. 1)—this correction maintains the "of the second part" language;

iii.  "a release position that permits the ~~releasable engagement~~ connection profile to ~~expand radially to~~ be released~~ the connection profile of the second part~~" (*see, e.g.*, *id*. at Abstract; 1:32-34; 3:29-32, 41-44; Fig. 1)—this correction omits all of the ambiguous language while remaining supported by the specification; and

iv.  "a release position that permits the releasable engagement profile to expand radially to ~~release the connection profile of the second part~~allow the releasable engagement profile to slide out of the way once the locking piston has been shifted" (*see id*. at 4:65-5:2; Fig. 1)—this is another correction that remedies the uncertainty and is consistent with the specification.

Ex. 2 at ¶¶ 67–68.  If the Court agrees that any one of the above corrections is reasonable, it cannot engage in judicial correction, and therefore the claims are invalid as indefinite.  *See Uniloc*, 2019 WL 1614724, at *11–13.

Plaintiff cites the *Pavo Solutions* case and suggests the facts are similar.  The instant case and *Pavo Solutions* are markedly different.  In *Pavo Solutions*, the claims suffered from "structural impossibility" and "did not make sense . . . rather than describe a realistic but perhaps undesirable result."  *Pavo Sols. v. Kingston Tech. Co*., 35 F.4th 1367, 1375 (Fed. Cir. 2022).  The

claimed invention in *Pavo* covered a USB memory stick with a main memory body housed in a case and a cover attached to the case that could pivot on a hinge.  The claim term at issue recited "pivoting the ***case*** with respect to the flash memory main body" and the plaintiff argued that "case" should be replaced with "cover."  In *Pavo*, it was structurally impossible for the case to pivot with respect to the main body because those pieces were one and the same and could not pivot relative to each other.  Thus, there was no reasonable way to make sense of the claims as written, and only one correction was reasonable.  *Id*.  That is not this case.  Here, the specification describes at least one connection profile (e.g. tubing connection 22) on the second part which makes the claims, as written, structurally *possible* (although ambiguous).  The structural possibility of a connection profile of the second part makes the argument that there is only one possible correction untenable.  Indeed, as shown above, the correction could be changing which part (first or second) is being referenced or it could be a separate part of the claim leaving the "second part" language intact.  Additionally, in *Pavo*, "the specification . . . confirm[ed] the error in the claims by ***exclusively*** describing a flash memory device with a pivoting cover."  *Id*. (emphasis added).  That is unlike this case where the '122 Patent's specification describes and the figures depict connection profiles on both the first and second parts, not just on the first part exclusively.

Pavo Solutions is distinguishable, but *Parthenon Unified Memory Architecture LLC v. Apple Inc.*, is a case directly on point.  In this factually similar case, Judge Gilstrap declined to correct a patent under conditions very similar to the one in the instant case.  No. 2:15-cv-00621-JRG-RSP, 2016 WL 3365945 (E.D. Tex. June 16, 2016).  The claims at issue in *Parthenon* introduced "a decoder coupled to the main memory via **a first bus interface**" and "a central processor circuit coupled to the main memory via **a second bus interface**", then later referenced

"**the <u>first</u> bus interface** of the central processing circuit and the decoder." *Id.* at *11.  The court

noted that "the first bus interface of the central processing circuit" lacked antecedent basis since

the claims introduced the first bus interface as associated with the decoder, not the central

processing circuit. *Id.* at *13–14.  Just as here, the plaintiff, PUMA, asserted that the only

reasonable correction to the claims would be changing "second" to "first." *Id.* at *13.  The

defendant, Apple, on the other hand proposed that the term could also be corrected as follows:

"the first bus interface of the ~~central processing circuit~~<u>decoder</u> and the ~~decoder~~<u>central processing

circuit</u>." *Id.*  The court found Apple's construction "likewise reasonable" and "not [in] conflict

with the specification," and therefore held that a reasonable debate existed. *Id.* (noting that

"[t]he Federal Circuit's standard does not ask the Court to decide which proposed construction is

most plausible").  This is precisely the case here—all of Defendants' proposed corrections are

"reasonable" and "not [in] conflict with the specification." *Id.*  Because there are multiple

reasonable corrections, the "nearly impossible" standard is not met and judicial correction is not

appropriate.[3]  Therefore the only proper result is for the Court to hold all claims in the patent

invalid as indefinite.[4]  *See supra* Section III.A.1.

B.    **"source of fluid pressure" (claims 1, 13)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Component(s) that communicate(s) fluid pressure | Origin of fluid pressure |

The parties dispute on this term hinges on whether the claimed "**source** of fluid pressure"

should include specifically disclosed embodiment—fluid pressure lines running from the surface

---

[3] Because the judicial correction inquiry ends when either there is not an obvious error on the patent's face or when the purported correction is subject to reasonable debate, the Court's analysis here need not reach evaluation of the prosecution history.  *See Parthenon*, 2016 WL 3365945 at *13–14 (finding a "reasonable debate exists" and not continuing on to analyze the prosecution history); *GREE, Inc. v. Supercell Oy*, No. 2:19-cv-00413-JRG-RSP, 2020 WL 6559435, at *17–18 (E.D. Tex. Nov. 6, 2020) (same); *Orbcomm*, 2015 WL 5302815 at *12–13 (same).

[4] If the Court holds that judicial correction is inappropriate, it need not reach the remaining claim construction disputes in the case because all of the patent's claims would be held invalid as indefinite.

as Defendants argue.  Or, should this fluid line embodiment be excluded, as Plaintiff suggests, despite this embodiment in the specification being expressly described as a "source of fluid pressure."  Defendants' construction is soundly grounded in the intrinsic record and should be adopted, while Plaintiff's construction runs afoul of the intrinsic record and sound claim construction principles.

Plaintiff's proposed construction is improper and its accompanying reasoning is flawed for several reasons.  ***First***, Plaintiff's argument that, in the fluid line embodiment, the "source" is the component that lies at the surface and "generates" the fluid pressure (e.g., a hydraulic pump) is inconsistent with the specification.  *See* ECF No. 84 at 18–19.  The specification does not require the source of fluid pressure to create the fluid pressure at a desired location.  In fact, it explicitly precludes such a narrow interpretation.  The specification states:

> Fluid pressure may include pressure applied by a liquid or a gas, which may be communicated to expansion chamber 38 in various ways. For example, there may be a gas cylinder that releases gas pressure upon activation, ***a fluid line that provides gas or liquid to expansion chamber 38 from surface, etc.***

Ex. 1 at 3:53-58 (emphasis added).  The specification later refers back to this very language as "**sources** of fluid pressure discussed above."  *Id.* at 4:10 (emphasis added).  Put another way, the specification makes abundantly clear that "source of fluid pressure" includes the specific examples provided in column 3, i.e, a gas cylinder or fluid line that provides pressure from the surface. Ex. 2 at ¶ 37.  Plaintiff's attempt to ignore this strong specification evidence cannot be correct because the specification can often be, as it is here, "dispositive" and "the single best guide to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315.

***Second***, Plaintiff's construction would improperly exclude the fluid line embodiment, and Plaintiff has not and cannot present any evidence to overcome the Federal Circuit's "strong presumption against a claim construction that excludes a disclosed embodiment."  Ex. 2 at ¶¶

38–39; *Nobel Biocare Servs. AG v. Instradent U.S., Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018) ("there is a strong presumption against a claim construction that excludes a disclosed embodiment"); *Wasica Fin. GMBH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1282 (Fed. Cir. 2017) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification." quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007)).   Plaintiff attempts to run around this consequence by asserting that the claims are not directed to the fluid line embodiment.   ECF No. 84 at 18.   But this makes no sense when evaluating the claims as written.   Claims 1 and 13 do not require the source to create the fluid pressure at the desired location.   Rather, the claims only require that the source "apply" fluid pressure to the locking piston upon activation.   Additionally, claim 7 mirrors all limitations of claim 1 except that it specifically claims "a combustible," instead of the more general "a source of fluid pressure."   This demonstrates that when the patentee wanted to exclude certain embodiments such as the surface pressure embodiment, the patentee was clear and unequivocal in doing so.   Ex. 2 at ¶ 40.   That said, a POSA would understand the patentee's use of "source of fluid pressure," in claims 1 and 13 to be consistent with that same language as used in the specification.   *Phillips*, 415 F.3d  at 1316 ("Thus claims must be construed so as to be consistent with the specification, of which they are a part." quoting *Merck Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)).   Thus, the term would include all examples listed in the specification.   *See id.*; Ex. 2 at ¶¶ 37, 43.

**Third**, Plaintiff's construction almost exclusively relies on extrinsic evidence, namely dictionary definitions and unrelated patents, that cannot take precedence over the clear intrinsic record.   *See Phillips*, 415 F.3d at 1317; *see also Finjan, Inc. v. Cisco Sys.*, 837 F. App'x 799, 806 (Fed. Cir. 2020) ("Where, as here, 'an analysis of the intrinsic evidence alone will resolve any

ambiguity in [the] disputed claim term,' it is 'improper to rely on extrinsic evidence.'" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996))).  What is more, Plaintiff's reliance on entirely unrelated patents in the industry is misplaced, as the Federal Circuit has explained that claims "of an unrelated patent 'shed[] no light on' the claims of the patent in suit." *E.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 727 (Fed. Cir. 2014) (quoting *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1211 (Fed. Cir. 2002)); *Buggies v. Hous. Heavy Mach.*, No. H-21-616, 2022 WL 1639284, at *9 (S.D. Tex. May 24, 2022) ("[T]he precedent is clear that claims in unrelated patents are irrelevant.").

*Fourth*, Plaintiff's contention that Defendants' construction is too broad as it would allow for "countless" sources of fluid pressure is unfounded and based on incredulity—not any sound cannon of claim construction.  Just because a construction may result in a large quantity of "sources," does not make it incorrect.  On the other hand, a construction that is so narrow it excludes explicit embodiments faces a strong presumption that the construction is incorrect. *Nobel*, 903 F.3d at 1381 (Fed. Cir. 2018); *Wasica*, 853 F.3d at 1282 (Fed. Cir. 2017).  But, as a practical matter, the sources of pressure are rather limited as described in the specification—a fact Plaintiff does not address.

Once the Court rejects Plaintiff's improper construction, it need look no further than the clear intrinsic record to adopt Defendants' construction.  In accordance with the intrinsic evidence—the claim language and specification language already discussed above—the Court should construe "source of fluid pressure" to mean "component(s) that communicate(s) fluid pressure."  The Court can rest easy that the remaining intrinsic evidence—the prosecution history—supports Defendants' construction as well.  During prosecution, the Examiner rejected then pending claim 1 as anticipated by U.S. Patent No. 6,095,583 ("Beeman", Ex. 5).  Ex. 3 at

27.  The Examiner explained in part, "[r]egarding claim 1, Beeman teaches: . . . a source of fluid pressure (Beeman 10:19-22, 38-41) . . . ."  *Id.* at 27–28.  The passages of Beeman cited by the Examiner state: "[t]he introduction of fluid (e.g. ***pumped from the surface down through a tubular string*** to which the tool 100 is connected)" and "***fluid at sufficient pressure is again pumped*** into the action chamber 150."  Ex. 5 at 10:19-23; 10:37-40 (emphasis added); *see also* 7:44-46; 8:36-40.  The Examiner's application of Beeman to claim 1, with respect to the source of fluid pressure element, makes clear to a POSA that the "source of fluid pressure" includes fluid lines running from the surface.  Ex. 2 at ¶¶ 41–42.

Plaintiff would have the Court ignore the overwhelming intrinsic evidence to interpret "source" to mean "origin" and would further have the Court determine that fluid lines running from the surface are not sources, since (in Plaintiff's view) the source must "generate" the fluid pressure instead of just "communicating" it.  ECF No. 84 at 19.  However, nowhere in the intrinsic record is "source" defined or even described as something that must "generate" fluid pressure.  Ex. 2 at ¶ 38.  Plaintiff's insistence on equating "source" with "origin" runs afoul of well-established Federal Circuit precedent that precludes "a claim construction divorced from the context of the written description."  *Eon*, 815 F.3d at 1320 ("Ordinary meaning is not something that is determined 'in a vacuum.' . . . To the contrary, 'a word describing patented technology takes its definition from the context in which it was used by the inventor.'").  In the context of the '122 Patent, the "source" of fluid pressure to the releasable connection is the component that communicates the fluid pressure to the locking piston to move it.[5]  Ex. 2 at ¶¶ 34, 43.

C.   **"a releasable engagement profile which *internally engages* the connection profile of the first part" (claims 1, 7, 13)**

---

[5] In the event the Court believes additional clarification in Defendants' construction is necessary, Defendants propose the following revision to its construction for this term:  Component(s) that communicate(s) fluid pressure <u>to move the locking piston</u>

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| An engagement mechanism that has an internal cavity which receives and latches onto a male connector forming a connection independently of the locking piston | Plain and ordinary meaning, but to the extent the Court believes an express construction may aid the jury, Plaintiff proposes: a releasable engagement profile with an inner portion that engages the connection profile of the first part |

The dispute here centers on giving meaning to the language "internally engages" that is the crux of the invention described in the specification and that Plaintiff added during prosecution to overcome a prior art rejection.  Defendants' proposal accounts for this meaningful concept and change to the claim language, while Plaintiff attempts to ignore the added language and recapture the types of connections it gave up by making the amendment.

1. Defendants' Proposed Construction is Fully Supported by the Intrinsic Record

Defendants' proposed construction is supported by the intrinsic record.  Plaintiff's proposal, on the other hand, gives no effect to vital parts of such record, twists the meanings of claim terms, and ignores the prosecution history to attempt to recapture claim scope plainly surrendered to secure the patent.

As an initial mater, all of Plaintiff's arguments for this term rely on a fundamental misinterpretation of the words "internally engages."  In the context of the intrinsic record, when a component "internally" engages, it simply means that it receives something on the inside. Plaintiff gravely twists the words internally engages and creates "internal portions" and "external portions" (i.e., faces or sides) for each component in the tool.  Plaintiff's reasoning is that "external" refers the side or face "that is close to the exterior of the release tool," while "internal" refers to the side or face "that is closer to the longitudinal axis (i.e., the most 'inner' portion) of the release tool."  ECF No. 84, Rodgers Dec. at ¶ 47.  However, "internally" is not used in the claims to characterize sides of components, as Plaintiff would have it.  In the claims, "internally"

21

is an adverb that modifies the verb "engages," restricting the action of engaging to only engaging

something on the inside.  As discussed in more detail below, the prosecution history strongly

supports this understanding.

Defendants' proposed construction may be split into two parts for claim construction

analysis purposes—"An engagement mechanism that has an internal cavity which receives and

latches onto a male connector" and "forming a connection independently of the locking piston."

Starting with the first part, the prosecution history is telling and to avoid the legal consequences

of such history, Plaintiff has conveniently omitted crucial Federal Circuit precedent that

diminishes its position.

The prosecution history plays a "critical" role in claim construction as it "can often

inform the meaning of the claim language by demonstrating how the inventor understood the

invention and whether the inventor limited the invention in the course of prosecution, making the

claim scope narrower than it would otherwise be." *Aptalis Pharmatech, Inc. v. Apotex Inc.*, 718

F. App'x 965, 971 (Fed. Cir. 2018); *Personalized Media Commc'ns, LLC v. Apple Inc*., 952 F.3d

1336, 1340 (Fed. Cir. 2020).  The Federal Circuit has explained in multiple recent cases that

"**even in the absence of a clear and unmistakable disavowal**, . . . the prosecution history can

be evaluated to determine how a person of ordinary skill would understand a given claim term."

*AstraZeneca AB v. Mylan Pharms. Inc*., 19 F.4th 1325, 1335 (Fed. Cir. 2021) (quoting *Aptalis*,

718 F. App'x at 971) (rejecting arguments that "the prosecution history is irrelevant because

there is no clear and unmistakable disavowal of claim scope") (emphasis added); *Personalized

Media*, 952 F.3d at 1336.  Moreover, even absent clear disavowal, "an applicant's amendment

accompanied by explanatory remarks can define a claim term by demonstrating what the

applicant meant by the amendment."  *Personalized Media*, 952 F.3d at 1336.

22

During prosecution of the '122 Patent, the patentee amended the language of claim 1 as follows: "a releasable engagement profile which internally ~~that releasably~~ engages the connection profile of the first part." Ex. 3 at 15. The patentee made this narrowing amendment to overcome an anticipation rejection based on prior art U.S. Patent No. 5,984,006 ("Read", Ex. 4). *Id.* The Read patent discloses a series of independent slips that frictionally engage a tubular member. Read's slips do not have any sort of internal cavity that receive its connection profile on the inside. That said, the patentee was able to exclude independent components working together to create engagement, such as Read's slips, from the claim scope by amending the claim language from the all-encompassing term, "releasably engages" to the narrower term, "internally engages." Indisputably, Plaintiff narrowed the claim scope, and Plaintiff's expert, John Rodgers, even agreed that the amended claim language "no longer covered" releasable engagement profiles that are a "series of slips", as in Read. Ex. 2 at ¶ 47.

Plaintiff contends that this amendment is essentially irrelevant since (according to Plaintiff) all of the patentee's arguments to overcome Read were based on other amendments to the claim. ECF No. 84 at 8. This is an inaccurate and skewed view of the record. When arguing why amended claim 1 should overcome the Examiner's anticipation rejection based on Read, the patentee first described Read's release tool and its use of slips. Ex. 3 at 22. Then, using present invention language, the patentee stated: "In contrast, **in the presently claimed invention**, the **releasable engagement profile *internally engages*** the first part connection profile, which is exemplified by an expandable collet which **<u>surrounds</u>** the profile." *Id.* at 23 (emphasis added); *see Verizon*, 503 F.3d at 1306–07 (finding clear disavowal of claim scope where, during prosecution, the patentee distinguished prior art using "present invention" language). In other words, the patentee was distinguishing Read's slips from amended claim 1's releasable

engagement profile based on the "internally engag[ing]" nature of the profile.  This is corroborated by the patentee's explanation that, in the collet embodiment, the collet "surrounds" the connection profile.  This amendment and explanation convey to a POSA that the patentee deliberately limited the releasable engagement profile of its invention to only those profiles capable of receiving the connection internally, i.e., a female-type connection that receives a male connection profile.  Ex. 2 at ¶ 47.

The prosecution history further reinforces the first part of Defendants' construction since the Examiner specifically recognized, and the patentee did not refute, the male/female-type connections and the latching nature of the engagement between the connections.  During prosecution, the Examiner stated: "The engagement profile and connection profile shown in the drawings is a collet *latch system* (see 18/26/28 and 16/24). . . . The engagement profile is described as the outer/*female*/box portion of the latch and the connection profile is described as the inner/*male*/pin portion."   Ex. 3 at 6 (emphasis added).  In response, instead of correcting the Examiner's characterization, the patentee quoted the Examiner's exact language and provided further explanation.  *Id.* at 21–22.  On top of that, the patentee then expressly confirmed the latching nature of the engagement by explaining that "fingers 28" of the releasable engagement profile "*latch* the shoulder defined by the intersection of the fish neck profile 24 and the lip of the connection profile 16."  *Id.*  This makes abundantly clear that the patentee understood the invention to have an engagement mechanism with an internal cavity that receives and latches onto a male connector.  Ex. 2 at ¶ 48.  This is the crux of the invention and the Examiner and patentee explained it exactly as Defendants do in their construction.  Plaintiff cannot now argue that this interpretation is too narrow and disregard the clear limitations promulgated through the

24

course of prosecution, simply because it works against them.  *See AstraZeneca*, 19 F.4th at 1335; *Aptalis*, 718 F. App'x at 971.

Setting aside the prosecution history, the first part of Defendants' construction is also supported by the rest of the intrinsic record.  Figure 1 of the patent depicts the collet embodiment in the release position.  The specification explains that the "releasable engagement profile 26 is a collet with a series of resilient fingers 28."  Ex. 1 at 3:12-13.  The series of fingers form a ring or skirt with a hollow inside, into which the connection profile 16 is inserted.  This insertion action is shown in Figure 1 by the arrow.  *Id.* at Fig. 1.  A POSA would therefore understand that the engagement mechanism here has an internal cavity that receives and latches onto the male connector component, i.e., connection profile 16.  Ex. 2 at ¶ 49.

The second part of Defendants' proposed construction—that the engagement between the releasable engagement profile and connection profile happens "independently of the locking piston"—is likewise aptly supported by the specification.  As demonstrated in Defendants' Technology Tutorial, when the release tool is assembled, the releasable engagement profile and connection profile are connected, *then* the locking piston is slid overtop to lock the components in place.  *See* Defs.' Tech. Tutorial at 7:30-7:42.  The specification provides: "Once piston 32 has been shifted sufficiently, second part 14 may be ***disengaged*** from first part 12 ***by pulling applying [sic] a sufficient force to second part 14*** to disengage releasable engagement profile 26 from connection profile 16."  Ex. 1 at 4:62-65.  The specification also states that "when released, fingers 28 are pushed outward as first and second parts 12 and 14 move away from each other," indicating that disengagement of the releasable engagement profile and connection profile happens simultaneously with, and because of, an uphole force pulling the first and second parts apart.  *Id.* at 3:18-20.  A POSA would understand these passages to mean that, once the piston

has shifted, the releasable engagement profile remains in engagement with the connection profile until an uphole pulling force is applied to the second part.  Ex. 2 at ¶ 50.

Without addressing, or even acknowledging, either of the pertinent specification passages quoted above, Plaintiff baldly asserts that the second part of Defendants' construction is inconsistent with the specification.  Plaintiff points to and uses language such as "holds . . . into engagement," "'locking' [] together", and "directly constrain[ing]" to argue its position.  However, it does not necessarily follow from any of that language that the locking piston *forms* the engagement, or that the connection *automatically* disengages upon shifting of the piston.  By way of example, when you unlock a door, it does not automatically fly open.  And the door's latching (i.e., closing) happens independently of the lock.

> 2. Plaintiff's Proposed Construction is Overly Broad and Attempts to Recapture Surrendered Claim Scope

Plaintiff's proposed construction attempts to improperly recapture claim scope that the patentee surrendered to obtain allowance.  *Hakim v. Cannon Avent*, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007) (explaining that a patentee cannot use claim interpretation to recapture claim scope that was surrendered during prosecution).  As explained above, the prosecution history clearly demonstrates that the patentee limited the invention to cover only certain types of releasable engagement profiles—those with an internal cavity capable of receiving and latching onto a male connection profile.  Nonetheless, Plaintiff proposes a construction that would capture *any* type of releasable engagement profile that "physically contacts" *any* type of connection profile on the releasable engagement profile's "inner portion" (i.e., its side or face closer to the longitudinal axis of the tool, as defined by Plaintiff).  Not only is this proposal so broad that it would cover numerous engagement mechanisms outside of the claimed scope, but it would also cover the very type of engagement mechanism the patentee amended claim 1 to

26

overcome—Read's slips.  The slips disclosed in Read have an "inner portion" (as defined by

Plaintiff) that "engages the connection profile[6] of the first part.".

Moreover, Plaintiff's reliance on the locking pins embodiment is flawed and misleading.

Plaintiff correctly points out that the specification contemplates an embodiment wherein the

releasable engagement profile is "locking pins" instead of collet fingers.  *See* Ex. 1 at 3:20-24.

However, Plaintiff only provides the Court with one hypothetical configuration of the locking

pins embodiment.[7]  ECF No. 84 at 5.  Plaintiff then relies on this one configuration to argue that

Defendants' construction excludes the locking pins embodiment.  It does not.

Below is another possible configuration of the locking pins embodiment—one that does

not just have locking pins floating in space as in Plaintiff's example created as a strawman.

### Locking Pins Embodiment



Locked Position (2D view)

Released Position (2D view)

Released Position (3D view)

---

[6] To the extent Plaintiff attempts to distinguish Read based on the connection profile having a protruding lip, they should be bound to the connection profile having a lip as a required limitation.  The lip on the connection profile is captured in the "latch" aspect of Defendants' construction.
[7] Plaintiff presented a different version of the locking pins embodiment in its Technology Tutorial that is blatantly inconsistent with the specification.  *See* Pl.'s Tech. Tutorial at 7:38-9:04.  This version shows recesses or cut outs formed in connection profile of the first part.  This is an improper and material structural redesign of the disclosures in the specification.  The specification is clear that the "connection profile 16 is a lip," *not* a recess, "that extends radially outward from fishneck 24."  Ex. 1 at 3:3-4.

Here, there is a series of locking pins (blue) arranged in a ring- or skirt-like fashion, just like the collet fingers. The locking pins sit in holes made in a female receiver that overlies the fishneck in the locked position (red), so as to keep the locking pins aligned with the connection profile of the first part (orange). The locking pins (blue) engage the connection profile (orange) and the locking piston (purple) slides overtop to secure the connection. Upon activation of the release tool, the locking piston (purple) shifts to allow the locking pins (blue) to move radially outward and disengage the connection profile (orange) upon application of an uphole force applied to the second part.

Contrary to what Plaintiff asserts, the series of locking pins is a ***female***-type connector that receives and latches onto the male-type connection profile of the first part (which remains structurally unchanged from the collet embodiment). The 3D view of the hypothetical configuration depicted above plainly shows that the female receiver containing the series of locking pins (blue) has an internal cavity into which the male connection profile is inserted. Accordingly, the locking pins embodiment is *not* excluded by Defendants' construction. Every tortured rendition by Plaintiff of why different male-female embodiments would be excluded by Defendants' construction is unfounded based on the logic explained in this Section.

In all, Defendants' proposed construction gives life to the clear limitations promulgated through the course of prosecution and is the only construction consistent with the entire intrinsic record. The Court should adopt Defendants' proposed construction.

D.     **"expansion chamber" (claims 1, 7, 8, 13)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Plain and ordinary meaning | One or more volumes that fluid expands into |

The dispute here is simple, as is the resolution. Should the claim be given its plain meaning as understood when reading the patent, as Defendants contend? Or should the patent be

read so broadly to include any possible volume that contains fluid, as Plaintiff contends?  The plain and ordinary meaning of "expansion chamber" in the context of the patent is apparent to a POSA, and should therefore be adopted by the Court.  Plaintiff's construction should be rejected because it assigns a significantly broader meaning to the term "expansion chamber" than its plain and ordinary meaning, makes the claims at issue more ambiguous rather than more clear, and renders portions of the claim language in claims 1, 7, and 13 superfluous.

The Federal Circuit's rules for claim construction provide that "[t]he ordinary meaning of a claim term is not 'the meaning of the term in the abstract.' Instead, 'the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent.'" *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (quoting *Phillips*, 415 F.3d at 1312).  As noted in the section above, a construction cannot be "divorced from the context of the written description" or determined "in a vacuum." *Id*.  Rather, a term "takes its definition from the context in which it was used by the inventor." *Id*. (quoting *Anderson v. Int'l Eng'g & Mfg., Inc.*, 160 F.3d 1345, 1348–49 (Fed. Cir. 1998)).

The intrinsic evidence here provides no special or unique meaning to "expansion chamber" other than its plain and ordinary meaning in the context of the patent.  Ex. 2 at ¶¶ 70–71.  Indeed, Plaintiff's expert in the preliminary injunction proceeding in this case, John Rogers, previously agreed that the term "expansion chamber" should be given its plain and ordinary meaning. *Id*. at ¶ 72; ECF No. 47-3 at ¶ 48 ("I have reviewed all claim terms recited in independent claims 13 . . . and understand them to be plain and simple from the perspective of a person having ordinary skill in the art. For example, a POSITA would have no trouble understanding terms such as . . .'expansion chamber,' . . . . Consequently, it is my opinion that all claim terms should be given their plain and ordinary meaning.").  A POSA would understand

that plain and ordinary meaning to be the chamber into which the locking piston expands or

shifts upon activation[8] because that is how the patent itself describes the expansion chamber.  *Id*.

at ¶ 73.

Contrary to Plaintiff's position that the shifting of the piston has nothing to do with the

meaning of "expansion chamber," the claims and specification contain important context relating

the expansion chamber to the locking piston and its movement.  To start, claims 1, 7, and 13

claim: "an expansion chamber in fluid communication with the locking piston."  The

specification explains this configuration of the expansion chamber with respect to the piston and

movement of the piston by reciting:

> In the depicted example, locking piston 32 is positioned within the
> outer housing 34 of second part 14, with a ***piston section 36 located
> in an expansion chamber 38, which seals around piston section 36
> while permitting axial movement***, and a sleeve section 40 that
> depends from piston section 36.  Sleeve section 40 overlies
> releasable engagement profile 26 in the locked position such that
> fingers 28 are unable to be pushed back from connection profile 16.

Ex. 1 at 3:33-41 (emphasis added); *see also id*. at 3:50-53 (explaining how the expansion

chamber functions with respect to the locking piston).  This description of the expansion

chamber specifically requires <u>only</u> "***piston section 36***" (purple) to be located in the expansion

chamber.  The piston's sleeve section 34 (blue), which is separately referenced later in this

passage, is therefore not located in the expansion chamber.  Figures 1 and 2 (depicted below)

illustrate the well-understood meaning of "expansion chamber" in this patent by plainly

depicting expansion chamber 38 (green box) having an open space at its uphole end while the

release tool is in a locked position (Fig. 2), and expansion chamber 38's open space being

---

[8] Plaintiff's contention that Defendants concealed their construction in the IPR petition is disingenuous.  Defendants, acting in good faith, noted in their IPR petition that this term was disputed and they were using Plaintiff's construction for purposes of the IPR only, and that they reserved all rights to maintain its positions and objection in this litigation.  ECF No. 84, Ex. J at 33, n.3.

occupied by locking piston 32 once the release tool is in a release position (Fig. 1).  Figure 2 below also depicts how only piston section 36 resides inside the expansion chamber in the locked position, while sleeve section 34 resides outside the expansion chamber.  As can be seen below, the expansion chamber (38) is the green box that the locking piston expands or shifts into.



Figure 2 *(locked position)*          Figure 1 *(release position)*

Ex. 1 at Figs. 1-2 (annotated).

Contrary to its own expert's opinion earlier in this case, Plaintiff now proposes an absurdly broad construction that runs afoul of multiple well-established claim construction principles.  To start, Plaintiff's construction is inconsistent with the specification since, under Plaintiff's construction, the expansion chamber would include the space around sleeve section 34 of the piston (and much more) when the tool is in the locked position.  Ex. 2 at ¶ 78. Additionally, under Plaintiff's proposed construction, any volume where fluid expands is an expansion chamber.  For example, the pressure equalization ports and even the wellbore space around the release tool would qualify as part of the expansion chamber, since they are no doubt

volumes that fluid expands into. *Id* at ¶ 77. This is incorrect and is unsupported by the specification.

Plaintiff's construction is further inconsistent with the specification as it would result in the expansion chamber and combustion chamber ***always*** being one (expansion) chamber. *Id*. at ¶ 77. The specification distinctly describes the expansion chamber and combustion chamber as two separate chambers with separate functions. *See, e.g.*, Ex. 1 at 3:35-37; 3:50-53; 3:59-65. The specification even identifies a different component, ports 44, that resides between the chambers and connects them, emphasizing the fact that they are entirely separate chambers. *Id*. at 3:59-65. While the specification notes that "expansion chamber 38 and combustion chamber 41 ***may*** be considered a single chamber, and ***may*** be designed as such," this language is permissive. *Id*. at 3:66-67 (emphasis added). In other words, the specification provides that the two chambers *may* be considered and designed as one, not that they *are* one.

Plaintiff's construction is also improper as it would render the "in fluid communication with" language of claims 1, 7, and 13 superfluous. *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored."). If "expansion chamber" were defined as all volumes that fluid expands into, as Plaintiff proposes, then by definition there would always be fluid communicating with the expansion chamber in order for the expansion chamber to exist. If this were the case, the language "in *fluid* communication with" would be meaningless because this "fluid communication" relationship between the locking piston and the expansion chamber would have to always exist. Ex. 2 at ¶ 79. Finally, Plaintiff again relies heavily on entirely unrelated patents to support its construction—an approach rejected by the Federal Circuit. *See E.Digital*, 772 F.3d at 727; *Buggies*, 2022 WL 1639284, at *9.

E.      **"wherein the first part carries a first electrical connection, and the second part carries a second electrical connection, the first and second electrical connection being electrically connected when the releasable engagement profile of the second part engages the connection profile of the first part, and becomes disconnected when the releasable engagement profile disengages the connection profile" (claims 12, 13)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Plain and ordinary meaning, with clarification that the first and second electrical connections are connected together within the releasable connection. |

The parties agree that this term should be given its plain and ordinary meaning, however, there is a dispute as to whether such plain and ordinary meaning includes a limitation on *where* the electrical connections are connected.  It does not include any such location requirement.

This term appears in claim 12 (which depends from claim 7) and claim 13.  Not a single one of these claims requires the electrical connections to be connected in a particular location.  Rather, the claims merely require that "the first part *carries* a first electrical connection" and "the second part *carries* a second electrical connections," and that the two electrical connections are connected when the tool is engaged and disconnected when the release tool is disengaged.  The term "carries" is undoubtedly broader than "within," since an object may carry something in more ways than just carrying it within.  The specification likewise does not indicate that the electrical connections **must** be connected in a particular location.  *See* Ex. 1 at 2:3-10; 4:27-36.

Plaintiff's crafty designation of its add-on limitation as a "clarification" cannot conceal that it is committing a "cardinal sin" of claim construction.  *Phillips*, 415 F.3d at 1320 (describing "reading a limitation from the written description into the claims" as "one of the **cardinal sins** of patent law") (emphasis added).  Attempting to support its add-on limitation, Plaintiff cites to the specification's description of an exemplary embodiment, which states in relevant part: "the electrical connection is made by the concentrically-located electrodes 52 and

33

54 to allow an electrical signal to pass through releasable connection 10." ECF No. 84 at 20; Ex. 1 at 4:32-35. This cannot, however, support inserting a location limitation into the claims at issue, where the claims are clearly void of any location-specific requirement. *See* Ex. 2 at ¶ 85.

Furthermore, claim 15 narrows claim 13 with a location-specification limitation: "the first electrical connection and the second electrical connection are concentrically disposed **within** the connection profile and the releasable engagement profile." This confirms that (i) these location limitations are not requirements of claims 12 and 13, and (ii) the patentee knew how to restrict the claim coverage to electrical connections in a particular location, particularly through the use of the word "within." *Acumed v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."). That said, if the patentee wanted to restrict the location of the connection to "within the releasable connection," the patentee would have added a limitation to that effect. *See id.* at 807 (declining to limit a claim where the intrinsic evidence suggested the patentee "knew how to restrict their claim coverage" in a particular way and yet "chose a different term that implies a broader scope").

When there is negligible evidence in the intrinsic record for a limitation, like here, Plaintiff proposes it. But when there is abundant evidence in the intrinsic record for a limitation, like for the disputed term in Section III.C., Plaintiff argues against it. Plaintiff cannot have it both ways. In light of the intrinsic evidence, this term should be given its plain and ordinary meaning, which does not include a limitation on where the electrical connections are connected.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court decline to judicially correct the patent and, then, render all claims invalid as indefinite. Should the Court find support in the law to judicially correct the pervasive ambiguity in both the claims and

specification, causing a need to do further claim construction, the Court should adopt each of

Defendants' proposed constructions.

Dated:  August 11, 2023                    Respectfully submitted,

                                           By:  *Aimee Perilloux Fagan*
                                           Aimee Perilloux Fagan, Attorney-in-Charge
                                           Texas State Bar No. 24010299
                                           SDTX Bar No. 430417
                                           afagan@sidley.com
                                           Phillip M. Aurentz
                                           Texas State Bar No. 24059404
                                           SDTX Bar No. 1585151
                                           paurentz@sidley.com
                                           Amanda Crawford-Steger
                                           Texas State Bar No. 24104756
                                           SDTX Bar No. 3146930
                                           asteger@sidley.com
                                           SIDLEY AUSTIN LLP
                                           2021 McKinney Avenue, Suite 2000
                                           Dallas, Texas 75201
                                           Telephone: (214) 981-3300
                                           Facsimile: (214) 981-3400

                                           **COUNSEL FOR DEFENDANTS
                                           WELLMATICS, LLC; GR ENERGY
                                           SERVICES MANAGEMENT, LP; GR
                                           ENERGY SERVICES OPERATING GP,
                                           LLC; AND GR WIRELINE, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served electronically on all counsel of record via the Court's ECF system on August 11, 2023.

*/s/ Aimee Perilloux Fagan*
Aimee Perilloux Fagan
